# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TETRA K. HARRISON, | : | |
| Plaintiff, | : | Case No. 3:14cv00218 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Tetra K. Harrison brings this case challenging the Social Security Administration's denial of her application for Supplemental Security Income.  She asserts here, as she did before the Social Security Administration, that she has been under a benefits-qualifying disability – starting on November 3, 1994 – due to debilitating health problems.  Social Security Administrative Law Judge (ALJ) Elizabeth A. Motta denied Plaintiff's application on the main ground that she was not under a "disability" within the meaning of the Social Security Act.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc.

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

#8), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc.

#14), the administrative record (Doc. #7), and the record as a whole.  Plaintiff advances

two main contentions: (1) ALJ Motta's decision should be reversed because it violated the

treating source rule; and (2) ALJ Motta's decision should be reversed because the ALJ

erred by not finding fibromyalgia to be a medically-determinable impairment.  (Doc. #8,

*PageID*#s 1378, 1382) (capitalization omitted).

## II.     Background

### A.     Plaintiff and her Testimony

Plaintiff was 35 years old on the date (March 22, 2012) she filed her application for

benefits.  This placed her in the Social Security Administration's "younger" person

category.  She has at least a high-school education, and she does not have any past-

relevant-work experience.  (Doc. #7, *PageID*# 75).

During an administrative hearing held by ALJ Motta, Plaintiff explained that she

has never really worked due to constant pain and her inability to sit or stand for long

periods of time.  She noted that arthritis causes pain in her kneecaps, lower back, and

elbow.  Her pain is also due to fibromyalgia.  Plaintiff testified that the fibromyalgia is

being treated with medication and she is "being sent to [pain] management ... as well."

(Doc. #7, *PageID*# 93).  On a typical day when her pain medications are helping, she

experiences pain at about level 6, using a 0 to 10 scale (0 = no pain; 10 = worst pain

imaginable).  She testified that her pain "feels like it's inside of my bones but it's in my

legs, in my arms, in my back." *Id*. at 101.  The pain throbs and burns, and she experiences daily muscle spasms in her back and the bottom of her feet.

Plaintiff can walk about 1 block before she needs to rest for 5 or 10 minutes.  With these rest breaks, she can walk a total of about 4 blocks in 1 day.  If she sits too long, her back starts hurting, and her "tailbone starts hurting really bad." *Id*. at 103.  She can sit for about 1 hour before pain causes her to move.  Then she needs to stand, but she can stand for only 10 minutes before then needing to sit or lie down.  Lying down provides her the most pain relief.  She lies on her side.  Yet, this too will hurt, causing her pain in the bones of her hip.  She can lift a gallon of milk but nothing heavier.

As to her daily activities, she cooks meals and does dishes.  She does not do any housecleaning and cannot lift laundry baskets.  She runs out of breath by going up and down stairs.  She grocery shops about once a week – her children carry the groceries. Plaintiff does not attend her children's school or after-school activities.  She does not go to school meetings.  She explained, "[T]hey go to school and I take them to school.  But we ... don't do much of anything because the most comfortable position for me is l[ying] down so I l[ie] a lot."  (Doc. #7, *PageID*# 95).  Plaintiff does not go out with friends.  She notes, "I don't trust people." *Id*.  She has a boyfriend but does not trust his friends.

### B.  <u>Medical Evidence</u>

Plaintiff became a patient at Rocking Horse Community Health Center no later than August 6, 2010.  *See* Doc. #7, *PageID*# 421.  Her records from Rocking Horse contained

3

notes from her office visits plus information about tests and imaging done at other facilities. *Id*. at 397-439.

In April 2012, one of the staff physicians at Rocking Horse, Dr. Elarossi, completed a Physician Certification of Medication Dependency for the Ohio Department of Job and Family Services. Dr. Elarossi identified Plaintiff's chronic medical conditions as (1) asthma, (2) bipolar disorder, (3) pituitary disorder, (4) dysuria, and (5) fibromyalgia. *Id*. at 488. He listed Plaintiff's medications as (1) albuterol sulfate, (2) nexium, (3) cymbalta, (4) pulmicort inhaler, and (5) imitrex. *Id*. Dr. Elarossi also completed a Basic Medical form. He indicated that the date of his last examination of Plaintiff was April 5, 2012. *Id*. at 490. He opined that Plaintiff could lift between 6 and 10 pounds on either an occasional or frequent basis; she could stand and walk 1 hour total and 1 hour without interruption during an 8-hour workday; and she could sit 2 hours total and 2 hours without interruption during the same 8-hour workday. *Id*. at 490. Dr. Elarossi checked a box on this form indicating that Plaintiff's "physical and/or mental functional limitations ... [are] expected to last between 9 and 11 months." *Id*. He further noted, "– see a neurologist for further eval." *Id*.

On May 29, 2012, Plaintiff saw rheumatologist Dr. Hackshaw upon referral by Dr. Elarossi. Dr. Hackshaw noted that Plaintiff, then age 35, had first experienced fibromyalgia symptoms at age 19. *Id*. at 508. On physical examination, painful tender points were elicited in greater than 11 of 18 sites. *Id*. at 509. Dr. Hackshaw diagnosed

4

Plaintiff with fibromyalgia, and he prescribed imitrex and gabapentin. *Id.* Dr. Hackshaw also noted that with a neuropathic state such as fibromyalgia, the basis of treatment is neuropathic medications and that narcotics "have no role in the treatment of neuropathic pain;" rather, the goal is to establish "some level of control to where pain is reduced by [about] 50% from baseline," and the patient can then adjust her neuropathic medications depending upon current needs, such as worsening pain with barometric changes. *Id*. at 510.

The administrative record contains additional medical records and medical source opinions. A detailed description of those records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because the ALJ's decisions accurately identified the relevant records with citations to evidence.

### III.    The "Disability" Requirement and Judicial Review

The Social Security Administration provides Supplemental Security Income to indigent individuals subject to several eligibility requirements. Chief among these requires an applicant to be a "disabled individual." 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security

lexicon.[2]  42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The second line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

6

647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

546-47 (6th Cir. 2004)).

## IV.    Two ALJ Decisions

To determine if an applicant for Supplemental Security Income is under a benefits-

qualifying disability, the Social Security Administration employs a 5-step sequential

evaluation.  *See* 20 C.F.R. §416.920(a)(4); *see also Colvin v. Barnhart*, 475 F.3d 727, 730

(6th Cir. 2007).

In 2007, Plaintiff filed a previous application for Supplemental Security Income.

On November 18, 2010, ALJ Thomas R. McNichols II denied Plaintiff's previous

application.  About 16 months later, in March 2012, Plaintiff filed an additional

application.  Additional medical evidence was submitted, including Plaintiff's records

from Rocking Horse Community Health Center.  After an administrative hearing, ALJ

Motta issued the non-disability decision that Plaintiff challenges in the present case.  (Doc.

#7, *PageID*#s 66-76).

For present purposes, ALJ Motta's central findings begin at step 2 of the sequential

evaluation.  She concluded at step 2 that Plaintiff has the following severe impairments:

"asthma, dysthymia, anxiety, and polysubstance abuse ... in possible remission."  *Id*. at 68.

ALJ Motta found that Plainiff's severe impairments did not include fibromyalgia.  She

observed that fibromyalgia "is mentioned throughout the record, but the required clinical

findings are not documented in the medical record.  (Doc. #7, *PageID*# 70).  She

explained:

> The only detailed evaluation was with a rheumatologist [Dr. Hackshaw] in
> May 2012.  There were painful tender points (11 of 18) but the examiner said
> that while she might possibly have fibromyalgia, there were some underlying
> psychological issues, and he made clear to her that she would not be getting
> narcotics.  Fibromyalgia was considered as not severe in the prior ALJ
> decision.  The BDD considered it as well – Exhibit B5A at 2 [*PageID*# 86]–
> and again on informal remand (Exhibits 11F and 12F) and still adopted the
> prior ALJ findings.

(Doc. #7, *PageID*# 70).

At step 3, the ALJ found that Plaintiff does not have an impairment or combination

of impairments that meets or medically equals the severity of an impairment in the

Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step 4, ALJ Motta assessed Plaintiff's residual functional capacity, or the most

she can do in a work setting despite her limitations.  20 C.F.R. §404.1545(a); *see Howard*

*v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).  ALJ Motta concluded:

> [Plaintiff] has the residual functional capacity to perform a reduced
> range of medium work ... with the following limitations: no climbing
> ladders, ropes, or scaffolds; work that would not involve exposure to hazard;
> she should not be expected to perform jobs that would require exposure to
> irritants; she is further restricted to simple 1- or 2-step tasks requiring little,
> if any concentration; low stress work that would not involve production
> quotas or over-the-shoulder supervision; jobs that would require only limited

contact with supervisors and co-workers; and she should not be expected to perform jobs that would require teamwork.

(Doc. #7, *PageID*# 71).

At step 5 of the sequential evaluation, ALJ Motta found that given Plaintiff's age, education, work experience, and residual functional capacity, a significant number of jobs exist in the national economy that she could perform. This led to ALJ Motta's ultimate conclusion that Plaintiff was not under a benefits-qualifying disability.

**V.    Discussion**

Plaintiff contends that ALJ Motta's analysis of Dr. Elarossi's opinion was deficient and produced reversible error. She reasons, "The ALJ made no attempt to rebut the presumption that Dr. Elarossi's opinion was still entitled to deference even if it was not entitled to controlling weight." (Doc. #7, *PageID*# 1379). She further maintains that the ALJ made no connection between Dr. Elarossi's opinion and the substantial cache of records provided by Rocking Horse Community Health Center.

Social security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the

9

claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citations omitted).[3] To effect this hierarchy, the Regulations adopt the treating physician rule. *See Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242; *cf. Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("in fact the technical name for the 'treating physician' rule is the 'treating source' rule"). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d at 376 (citation omitted); *see Gentry*, 741 F.3d at 723. If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed

---

[3] The Social Security Administration has re-lettered 20 C.F.R. §416.927 without altering the treating physician rule or other legal standards  The re-lettered version applies to decisions, like ALJ Motta's, that issued on or after April 1, 2012.

upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good

reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight

placed on a treating source's medical opinions."  *Id*. (quoting Soc. Sec. Rul. 96-2p, 1996

WL 374188 at *5 (1996)).  The goal is to make clear to any subsequent reviewer the

weight given and the reasons for that weight.  *Id*.  Substantial evidence must support the

reasons provided by the ALJ. *Id*.

> In the present case, ALJ Motta explained with regard to Dr. Elarossi's opinions:

> A physician from Rocking Horse Medical Center completed a Basic
> Medical form for the county welfare department, on which he reported that
> the claimant would be unemployable for only between nine and eleven
> months.  However, this fails to meet the durational requirements of the Act.
> Further, there is nothing in terms of objective physical findings or treatment
> history that would even remotely support a limitation to sitting, standing, and
> walking to a combined total of three hours a day.  No significant weight is
> given in this assessment.

(Doc. #7, *PageID#* at 73).  The ALJ was specific enough about the weight she placed on

Dr. Elarossi's opinions – no significant weight.  But the ALJ misperceived the nature of

fibromyalgia by pointing to the lack of objective physical findings supporting Dr.

Elarossi's opinions.  "[U]nlike medical conditions that can be confirmed by objective

medical testing, fibromyalgia patients present no objectively alarming signs."  *Rogers*, 486

F.3d at 243.  "The process of diagnosing fibromyalgia includes (1) the testing of a series of

focal points for tenderness and (2) the ruling out of other possible conditions through

objective medical and clinical data."  *Id*. at 244.  Given this, the ALJ's emphasis on the

lack of objective evidence does not identify a valid reason for discounting Dr. Elarossi's

11

opinions about Plaintiff's work limitations.  This shortcoming was not harmless error

because a specialist, Dr. Hackshaw, examined Plaintiff and found tender points in more

than 11 of 18 sites.  (Doc. #7, *PageID#* at 509).  These are "medically-accepted and

recognized signs of fibromyalgia."  *Rogers*, 486 F.3d at 244.  And, consequently, such

findings supported Dr. Elarossi's opinions about the work limitations fibromyalgia caused

Plaintiff.

At step 2 of ALJ Motta's sequential evaluation, she addressed Dr. Hackshaw's

report concerning his examination of Plaintiff.  But, in doing so, the ALJ cast the report in

a light that implied Plaintiff was exaggerating or faking her symptoms to obtain narcotic

medications.  Substantial evidence does not support the ALJ's reading of Dr. Hackshaw's

report.  The ALJ recognized that Dr. Hackshaw "made it clear to her [Plaintiff] that she

would not be getting narcotics."  (Doc. #7, *PageID#* 70).  But, Dr. Hackshaw's notes do

not suggest that Plaintiff was engaged in drug-seeking behavior or was otherwise being

dishonest about her pain levels.  His report instead documents, "Neuropathic medications

form the basis of treatment for these conditions [fibromyalgia].  Narcotics have no role in

the treatment of neuropathic pain.  I explained to her that neuropathic syndromes are

generally long term syndromes that don't go away.  We try to obtain some level of control

to where pain is reduced by [approximately] 50% from baseline and further, try to

establish a regimen where she can adjust/manipulate her neuropathic medications as she

sees the need depending on current needs (which often worsen with barometric changes,

12

etc.).” *Id*. at 510.  This explanation merely documents Dr. Hackshaw's explanation to Plaintiff of his prognosis and suggested course of treatment for her fibromyalgia.  It is a far cry from evidence suggesting that Plaintiff sought narcotic medications for an illegitimate reason.

The ALJ also stated that Dr. Hackshaw indicated, “while she might possibly have fibromyalgia, there were some underlying psychological issues ....” *Id*. at 70.  Yet, Dr. Hackshaw did not hedge his diagnosis of fibromyalgia.  He plainly diagnosed fibromyalgia and set out a treatment plan including medications, further testing, and patient education about fibromyalgia. *Id*. at 69-70.  Dr. Hackshaw's concomitant observation that Plaintiff had underlying psychological issues, without more, does not cast doubt on the validity of his diagnosis, medical opinions, and treatment plan for Plaintiff's fibromyalgia.  And it does not suggest that Plaintiff was exaggerating or faking her pain levels.  Instead, it indicates that Plaintiff has additional health problems without negating or diminishing the seriousness of her fibromyalgia.

Plaintiff further maintains that ALJ Motta erred by not finding that new and material evidence existed after ALJ McNichols' earlier decision established fibromyalgia as a severe impairment at step 2.  The Commissioner contends that it was legally irrelevant for ALJ Motta to exclude fibromyalgia at step 2 because she continued to the remaining steps of her sequential evaluation.

The Commissioner is partly correct.  Generally, an ALJ does not commit an error

13

requiring reversal by finding a non-severe impairment when (1) the ALJ also found that claimant has at least one severe impairment, and (2) the ALJ considers both the severe and non-severe impairments during the remaining steps in the sequential evaluation. *See Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987). Indeed, "once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps." *Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003) (citation omitted). "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Fisk v. Astrue,* 253 F. App'x 580, 583 (6th Cir. 2007) (quoting *Maziarz,* 837 F.2d at 244).

In the present case, ALJ Motta's decision at step 4 does not indicate that she considered Plaintiff's severe and non-severe impairments when assessing her residual functional capacity. The ALJ did not refer to or consider Plaintiff's fibromyalgia at step 4 and, consequently, even if fibromyalgia was correctly characterized as a non-severe impairment, it was error for the ALJ to overlook or ignore it at step 4 when assessing Plaintiff's residual functional capacity. *Cf. Fisk,* 253 F. App'x at 583 (quoting, in part, *Maziarz,* 837 F.2d at 244) ("when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'"). This problem is further

14

implicated in the ALJ's conclusion at step 4 that the new evidence (provided after ALJ McNichols' previous decision) "fails to document a significant change in the claimant's condition." (Doc. #7, *PageID* # 72). Because the ALJ did not connect this conclusion to any mention of Plaintiff's fibromyalgia at step 4, the ALJ did not reasonably find that the record failed to document a significant change in her condition.

Lastly, the ALJ relied on record reviewing medical sources without weighing their opinions under any of the factors required by the regulations. This constituted error. The regulations require ALJs to weigh their opinions "based on the examining relationship, (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart*, 710 F.3d at 376 (citation). The ALJ's failure to evaluate the record-reviewers' opinion as the regulations require allowed the ALJ to overlook that these sources provided conclusory reviews of the record and no meaningful explanation to support their decision to accept ALJ McNichols' previous assessment of Plaintiff's residual functional capacity. *See, e.g.*, Doc. #7, *PageID#s* 103, 105.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## VI.  **Remand is Warranted**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

15

right.  *Bowen*, 478 F3d at 746.  Remand is warranted for an ALJ's failure to follow the

regulations, for example, when the ALJ failed to provide "good reasons" for rejecting a

treating medical source's opinions, *see Wilson*, 378 F.3d at 545–47; failed to consider

certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747–50;

failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d

at 725–26; or failed to provide specific reasons supported by substantial evidence for

finding the plaintiff to lack credibility, *Rogers*, 486 F.3d at 249.  Under sentence 4 of 42

U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501

U.S. 89, 99 (1991).  Consequently, a remand under sentence 4 may result in the need for

further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410;

*Felisky*, 35 F.3d at 1041.  The latter is warranted where the evidence of disability is

overwhelming or where the evidence of disability is strong while contrary evidence is

weak.  *Faucher v. Sec'y of Health & Humans Servs*., 17 F.3d 171, 176 (6th Cir. 1994).  A

remand for an award of benefits is unwarranted in the present case because the evidence of

disability is not overwhelming and because the evidence of a disability is not strong while

contrary evidence is weak.  *See id*., 17 F.3d at 176.  Yet, Plaintiff is entitled to an Order

remanding this matter to the Social Security Administration pursuant to sentence 4 of §

405(g) due to problems set forth above.  On remand the ALJ should be directed to review

Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying

16

disability, including, at a minimum, a re-assessment Plaintiff's residual functional

capacity, and a re-consideration of the evidence at step 5 of the sequential evaluation.

**IT IS THEREFORE RECOMMENDED THAT:**

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Tetra K. Harrison was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and a Decision and Entry adopting this Report; and

4.      The case be terminated on the docket of this Court.

June 10, 2015

                                s/Sharon L. Ovington
                                Sharon L. Ovington
                        Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).

18